NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>Pacific</u> <u>Reporter</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

RICHARD A. KINMON,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12645
Trial Court No. 4DJ-14-00005 CR

O P I N I O N

No. 2657 — October 4, 2019

Appeal from the District Court, Fourth Judicial District, Delta Junction, Matthew C. Christian, Judge.

Appearances: Wallace Tetlow, Tetlow Christie, LLC, Anchorage, for the Appellant. Aaron C. Peterson, Assistant Attorney General, Office of Special Prosecutions, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Harbison, Judge, and Coats, Senior Judge.[*]

Judge ALLARD, writing for the Court.
Judge HARBISON, dissenting.

---

[*]    Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Richard A. Kinmon, a licensed big game guide, was convicted of eleven misdemeanor offenses for his conduct during big game hunts he guided in 2009 and 2011. Some of Kinmon's convictions were based on allegations that he allowed his clients to take game without "previously purchasing" a big game tag as required by AS 16.05.340(a)(15). Kinmon was also convicted for falsely reporting that the tags had been "previously purchas[ed]" by the clients.

At trial, a dispute arose regarding the meaning of the statutory term "previously purchas[ed]." The State argued that the term "purchase" was unambiguous and that it required the client to pay money for the big game tag before the game was taken. Kinmon argued that the term could reasonably be understood as encompassing the delivery of the big game tag with a promise to pay in the future, after the game was taken. The trial court resolved this dispute in favor of the State, but the court did not instruct the jury on the definition of "previously purchased" and it allowed both sides to argue their definitions to the jury.

On appeal, Kinmon argues that the term "previously purchased" is ambiguous, and that the statutory term is unconstitutionally vague because it fails to give fair notice to the guide of what is required. Kinmon also argues that the trial court committed plain error by giving the jury a "mistake of law" instruction that he argues shifted the burden to him to prove that he did not knowingly violate the law. For the reasons explained here, we conclude that Kinmon is entitled to a retrial on four of his convictions.

*The pertinent hunting regulations*

During the offenses at issue in this case, Kinmon was a licensed big game guide in Alaska. He was also a licensed big game tag vendor, meaning he was authorized to sell big game tags in the field to nonresident hunters.

In Alaska, big game guides are regulated by the Big Game Commercial Services Board. After any guided, outfitted, or transported big game hunt, the guide must submit a hunt record to the Board.[1] All nonresident hunters must purchase a hunting license. Nonresident hunters who hunt big game also must purchase a specific big game tag for the animal they are hunting.[2] This is a metal locking tag that must be affixed to the animal right after it is killed.[3] The number on the tag corresponds with a big game tag record form that must be filled out and signed by the hunter.

Nonresident hunters who hunt moose and sheep must, in addition, submit forms to the Department of Fish and Game. The Department uses these forms to keep track of the number of hunters, the number of moose and sheep killed, and where they

---

[1]  *See* AS 08.54.760, which provides:

> (a) The department shall collect and maintain hunt records provided by a registered guide-outfitter. A registered guide-outfitter shall submit to the department a hunt record for each contracted hunt within 60 days after the completion of the hunt. A hunt record must include a list of all big game hunters who used the guiding or outfitting services of the registered guide-outfitter, the number of each big game species taken, and other information required by the board. The department shall provide forms for reporting hunt records.

[2]  Former AS 16.05.340(a)(15) (pre-2017) provided:

> A nonresident may not take a big game animal without previously purchasing a numbered, nontransferable, appropriate tag, issued under this paragraph. The tag must be affixed to the animal immediately upon capture and must remain affixed until the animal is prepared for storage, consumed, or exported. A tag issued but not used for an animal may be used to satisfy the tagging requirement for an animal of any other species for which the tag fee is of equal or less value.

[3]  *Id.*

were killed.[4] This paperwork comes in a packet and includes (1) a harvest overlay, (2) a harvest report, and (3) a harvest ticket. The harvest overlay is submitted to Fish and Game before the hunt. After the hunt, successful or not, the harvest report and the harvest ticket must be filled out and mailed to Fish and Game. The harvest ticket number and big game tag also must be recorded on the hunt record that guides are required to submit to the Big Game Commercial Services Board.

*Convictions in which "previously purchas[ed]" is at issue*

Kinmon was convicted of five counts of tampering with a public record in the second degree under AS 11.56.820(a)(1), five counts of committing or aiding in the commission of a violation of a big game statute or regulation under AS 08.54.-720(a)(8)(A), and one count of failing to report a violation of a big game law under AS 08.54.720(a)(1).

Eight of these eleven convictions involved allegations that Kinmon's clients had taken big game without "previously purchasing" big game tags. However, Kinmon's defenses to these charges were not uniform.

The first four charges (Counts I-IV) related to a guided sheep hunt in 2009 with a nonresident hunter, John Maser. Kinmon was convicted of four misdemeanor offenses related to Maser's sheep hunt: knowingly guiding Maser on a hunt for Dall sheep without a valid (*i.e.*, previously purchased) nonresident sheep tag and/or harvest

---

[4] *See* 5 AAC 92.010(h), which provides:

> For moose and sheep, a person may not hunt moose or sheep, except in a permit hunt or for moose in the Gates of the Arctic National Park, unless the person has in possession a harvest ticket for the species and has obtained a harvest report (issued with the harvest ticket).

ticket (Count III);[5] knowingly failing to report this illegal hunt to the Department of Public Safety as required (Count IV);[6] and two counts of tampering with a public record in the second degree for falsifying Maser's hunt and tag records to indicate that Maser had a valid (*i.e.*, previously purchased) tag at the time he killed the sheep (Counts I-II).[7]

On appeal, Kinmon argues that these four convictions hinged on the disputed meaning of "previously purchas[ed]." But the record does not support this. Unlike the clients from the other hunts, Maser testified that he did not fill out any paperwork for the sheep hunt (or pay for the sheep tag) until *after* he killed the sheep. Maser did not recall precisely when he filled out the paperwork for the sheep tag but he testified that it was after he killed the sheep. He also testified that Kinmon told him he would not have to pay for a sheep tag unless the hunt was successful. Maser further testified that, at Kinmon's direction, he backdated the form to September 15, two days before the sheep kill. Maser also testified that he backdated the check he gave Kinmon for the sheep tag to September 15, at Kinmon's direction.[8]

Kinmon contradicted Maser's sequence of events in his own trial testimony. Kinmon testified that the dates on the sheep tag and the check were correct; that Maser filled out the paperwork to procure the sheep tag in the field on September 15 and gave Kinmon a check for the tag later that same day. Kinmon also testified that Maser picked up the sheep harvest ticket and associated paperwork at Fred Meyer *before* the hunt, on

---

[5]   AS 08.54.720(a)(8)(A).

[6]   AS 08.54.720(a)(1).

[7]   AS 11.56.820(a)(1).

[8]   This testimony was partially corroborated by the investigating trooper, who said the harvest ticket overlay number previous to Maser's was issued to another hunter on September 16. The trooper conceded that it was possible the harvest tickets were issued out of order.

September 12, and that Maser must have made a mistake when he dated the forms September 15.[9]

The jury was thus faced with a choice between Maser's testimony that he did not fill out any of the required paperwork or pay for the sheep tag before hunting and Kinmon's testimony that Maser completed all the appropriate paperwork and paid for the tag before the hunt. Therefore, even if the district court had construed "purchase" to include filling out the paperwork to procure a tag with a promise to pay later, this would have had no effect on the jury's verdict on these counts.[10] Accordingly, we find Kinmon's argument regarding the purportedly ambiguous meaning of "previously purchas[ed]" moot as to his convictions for Counts I-IV.

This is not necessarily the case with the other convictions, however. Counts V-VII related to a grizzly bear hunt that Kinmon guided in 2011 for nonresident hunter Joseph Hahn. Kinmon was convicted of one count of knowingly aiding Hahn in taking a brown bear without a valid (*i.e.*, previously purchased) nonresident big game tag (Count VII)[11] and two counts of tampering with a public record in the second degree for knowingly falsifying Hahn's big game hunt and tag records to indicate that Hahn had a valid (*i.e.*, previously purchased) big game tag at the time he hunted the bear (Counts V and VI).[12]

---

[9] Kinmon's testimony was corroborated by an employee of Kinmon's at the time, who testified that he was with Maser when he obtained the sheep harvest ticket on September 12.

[10] The jury had the option of basing Kinmon's convictions on alternative conduct — aiding Maser in violating 5 AAC 92.010(h) by hunting sheep without a harvest ticket in his possession — but there is no way to know which violation(s) the jury found. The jury was instructed that it had to be unanimous as to which statute or regulation was violated.

[11] AS 08.54.720(a)(8)(A).

[12] AS 11.56.820(a)(1).

The facts underlying Hahn's convictions were undisputed: Hahn testified that he waited to buy his bear tag until he was in the field, at Kinmon's recommendation, so that he would not have to pay for the bear hunt if there was no sign of bear in the area. Kinmon and Hahn both testified that Hahn filled out the paperwork to procure his bear tag prior to hunting the bear and that Hahn paid for the tag some days later, after the hunt was completed. Kinmon's related convictions for tampering with a public record were based on his reporting in Hahn's hunt and tag records that Hahn had purchased his bear tag before the hunt, at the time he filled out the paperwork for the tag, even though Hahn had not yet paid for the tag. Because these facts were undisputed, all three convictions potentially hinged on a legal conclusion that a "purchase" did not occur until Hahn paid for the bear tag.

The same is true with regard to Count XI, which related to Kinmon's guided moose hunt with Shelley Ailts in 2011. Kinmon was convicted of knowingly aiding Ailts in taking a moose without a valid (*i.e.*, previously purchased) nonresident big game tag in that hunt (Count XI).[13] The facts underlying this conviction were also undisputed: Shelley Ailts went along on the hunt primarily to accompany her husband, but with the understanding that she could buy a moose tag and do her own hunt if there was time. Kinmon and Shelley Ailts both testified that she filled out the paperwork to procure her moose tag in the field before she hunted the moose. Shelley Ailts's husband testified, uncontradicted, that he did not pay Kinmon for his wife's moose tag until after the hunt was over. Thus, this conviction also potentially hinged on a legal conclusion that a "purchase" did not occur until Shelley Ailts paid for the moose tag.

---

[13] AS 08.54.720(a)(8)(A).

*How the issue was litigated below*

After the State presented its case, Kinmon moved to dismiss all the counts against him, arguing that the State "has failed to show even that a crime has been committed in some of these . . . [t]here's been no showing that failing to get payment right at the time you get the tags is a crime." To support this argument, Kinmon made an offer of proof that Anthony Lee, a longtime master guide, would testify based on his informal inquiries that it was standard practice among big game guides to issue tags before collecting money for the tags.

The court ruled outside the jury's presence that the commonly understood meaning of "previously purchasing" is to buy the goods ahead of time (in context, it is clear that the court meant by this that a "purchase" did not take place until money changed hands). The court excluded under Evidence Rule 403 Lee's proposed testimony on his informal study of the standard practice among guides, to which the defense attorney responded:

> This is a situation in which to my knowledge this is a first impression of what the law is, what purchase means, and to have a person charged with something that the court has suddenly declared "this is how it's illegal" is not real fair justice either. So I would suggest that the court dismiss [the case].

The court denied Kinmon's motion to dismiss.

Kinmon did not offer a jury instruction defining "previously purchasing" and no definition was provided to the jury. The parties instead argued their dueling interpretations of the legal meaning of "previously purchasing" to the jury. The prosecutor argued in closing:

> Previously purchasing, you all know what previously purchasing means. It doesn't mean to have an agreement to at some point maybe pay for it. . . . That isn't the law. The

law is it has to be previously purchased before taking the animal. That's the law.

The defense attorney countered:

> The statute — counsel had his magic lantern show up here and counsel had purchased, you got to purchase your tag ahead of time. Doesn't say you have to pay for it, does it? Seems to me if you're going to prosecute somebody you ought to have in there what does it mean, what does purchase mean. Did you purchase your house, have you paid for it, no, might still be making payments on it, but you haven't purchased, you haven't paid for your house. How about a car, you buy a car. I don't know what they do here, but down in Anchorage no money down, no payments for six months. You drive out of the lot with the car, have you purchased that car, yeah, have you paid for it, no. In Alaska and the United States we pay for things ahead of time and sometimes we pay for things down the trail. . . . [T]hey built this case on a definition on an interpretation of what the statute says and it doesn't say "paid for," it says "purchased."

The trial court provided no guidance to the jury regarding how this legal term should be defined.

*Is the term "previously purchas[ed]" ambiguous?*

A statute is ambiguous if its meaning "is unresolvably confused or ambiguous after it has been subjected to legal analysis [through] study of the statute's wording, examination of its legislative history, and reference to other relevant statutes and case law[.]"[14] If a statute is unresolvably ambiguous following this analysis, the rule of lenity requires that it be construed in the defendant's favor.[15]

---

[14] *Anchorage v. Brooks*, 397 P.3d 346, 349 (Alaska App. 2017) (alterations in original) (emphasis omitted) (quoting *DeNardo v. State*, 819 P.2d 903, 908 (Alaska App. 1991).

[15] *DeNardo*, 819 P.2d at 907.

As a general rule, "[u]nless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage."[16] In ruling that a "purchase" did not take place under AS 16.05.340(a)(15) until money changed hands, the district court relied on a version of Black's Law Dictionary that defined "purchase" as "the act or instance of buying." In its brief, the State points to a version of Webster's Dictionary that defines "purchase" to mean "to obtain by paying money or its equivalent." Kinmon argues that neither of these definitions necessarily require that a purchase involve simultaneous payment.

Kinmon also points to a California Fish and Game statute that defines "purchase" to include "an offer to buy, purchase, barter, exchange, or trade."[17] A New Jersey statute governing the sale or purchase of wildlife also defines "sell or purchase" more broadly, to mean "to sell or offer for sale, possess for sale, purchase or agree to purchase, receive compensation, barter or offer to barter, trade or offer to trade, or transfer or offer to transfer, or conspire for any of those purposes."[18] In contrast, a Florida statute governing the purchase and delivery of firearms defines "purchase"

---

[16] *State v. Debenham Electric Supply Co.*, 612 P.2d 1001, 1002 (Alaska 1980) (citing *Lynch v. McCann*, 478 P.2d 835, 837 (Alaska 1970)); *see also* AS 01.10.040 ("Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage. Technical words and phrases and those that have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.").

[17] Cal. Fish & Game Code §§ 68, 24 (West 1985).

[18] N.J. Stat. Ann. § 23:4-27(g) (West 2016).

narrowly, as the district court did in this case, to mean "the transfer of money or other valuable consideration to the retailer."[19]

The State argues that the policy behind the "previously purchasing" requirement is to ensure that hunters pay for the privilege of hunting regardless of whether the hunt is successful. But it is not clear that this policy interest would be undermined by allowing a hunter to obtain a tag before the hunt with a promise to pay at the close of the hunt. Joseph Hahn testified that he believed he purchased the tag when he filled out the paperwork to procure the tag, and he did not directly testify that he thought he would not have to pay for the tag if the hunt was unsuccessful (Kinmon did testify that he told Hahn he would cover the cost of the tag if Hahn did not kill the bear). Shelley Ailts was not asked this question directly, but the trial testimony suggested that she also believed she was in effect purchasing the tag at the time she filled out the paperwork to procure the tag. Kinmon testified, without contradiction, that a big game tag record is a three-part carbon form, and "[w]hen one of these forms gets signed that tag is obligated and either myself or the hunter's going to pay for it." He said license vendors are required to account for every tag number in a monthly report submitted to regulators.[20] He also said that "sometimes you issue many, many tags, you might issue a license, two or three tags . . . and it's set up to accommodate guides in the field so they could take one check at the end of the hunt to cover all additional expenses that the . . . client incurs." Under this view, filling out the paperwork for a tag or tags during a guided hunt is like running a tab at a bar; the expectation is that the client will pay for all the costs associated with the hunt, including the tags, at the end of the hunt.

---

[19] Fla. Stat. Ann. § 790.0655(1)(a) (West 2018).

[20] *See* AS 16.05.390(f) (requiring license vendors to transmit tag proceeds and reports "by the last day of the month following the month in which the licenses, permits, and tags are sold, unless an alternative reporting schedule has been established by contract").

To support his claim that the term "purchase" is ambiguous and should be construed in his favor, Kinmon points to this Court's decision in *State v. Chun*, an unpublished case.[21] In *Chun*, the State charged the defendant with violating a regulation that made it illegal to buy bear parts. The defendant purchased the bear parts over the phone from a man in Idaho, and she argued, relying on the Uniform Commercial Code (UCC), that the Alaska regulation did not apply to her conduct because the purchase took place in Idaho.[22] The district court agreed and dismissed the charge, ruling that, under the UCC, title passed to Chun at the time the Idaho seller placed the bear parts in the mail.[23]

This Court concluded that reasonable arguments could be made that the purchase took place in Alaska, either when the contract was formed (when Chun orally accepted the Idaho man's offer) or when the transaction was completed (when Chun received the bear parts in Anchorage).[24] Nevertheless, this Court affirmed the district court's decision dismissing the charge. After noting that the State had not offered any definition of "purchase" that clearly favored a different result, and that the State had not argued on policy grounds that "purchase" should be interpreted more broadly in the context of the game regulation at issue, this Court concluded that there was a "substantial and unresolvable ambiguity in existing law as to whether Chun performed a 'purchase'

---

[21] *State v. Chun*, 1992 WL 12153276 (Alaska App. Oct. 7, 1992) (unpublished).

[22] *Id.* at *1.

[23] *Id.* at *1-2.

[24] *Id.* at *1-3.

within Alaska."[25] This Court therefore applied the rule of lenity and construed the term in Chun's favor.[26]

*Chun* provides no direct guidance on the definition of "purchase" in this case but it does underscore the potential complexity of determining when a purchase takes place in the absence of statutory guidance. We agree with Kinmon that "previously purchas[ed]" could reasonably be construed to encompass the delivery of goods with a binding promise to pay in the near future. However, it is not clear that such binding promises to pay were made in this case. As already noted, the testimony on this issue was sparse and potentially subject to varying interpretations by the jury. The jury also did not receive a clear instruction of what "previously purchas[ed]" meant in this context, and the jury was not instructed that this term could include filling out the tag paperwork, receiving the tag, and making a binding promise to pay for the tag after the hunt was over.

Instead, both sides were allowed to offer their own legal definitions of the term "previously purchas[ed]." This was error. The district court had a duty to resolve this question of statutory interpretation and to instruct the jury on the proper legal definition of this term.[27] Because that instruction did not occur, we conclude that

---

[25] *Id.* at *2-3.

[26] *Id.* at *3.

[27] *Roth v. State*, 329 P.3d 1023, 1026 (Alaska App. 2014) ("[T]he jury need[s] to know whether to follow the prosecutor's suggested interpretation of the statute, or the defense attorney's competing interpretation of the statute, or some other interpretation."); *Eaklor v. State*, 153 P.3d 367, 370 (Alaska App. 2007) ("[W]hen the statutory language defining an element of a crime 'is susceptible of differing interpretations, only one of which is a proper statement of the law,' and when the defendant's guilt or innocence may turn on the jury's understanding of this element, 'an instruction [on the meaning of this element] must be given[.]'" (quoting *McKee v. State*, 488 P.2d 1039, 1043 (Alaska 1971))).

Kinmon is entitled to reversal of the counts related to the Joseph Hahn and Shelley Ailts hunts (Counts V-VII and Count XI). If the State chooses to retry these counts, the jury should be instructed that the delivery of the tag with a binding promise to pay is sufficient to qualify as a "previous purchas[e]" under the statute. Construing the statute this way is in accord with the rule of lenity and ensures that licensed big game guides are on notice of the prohibited conduct.

*Was it plain error for the trial court to instruct the jury on the affirmative mistake of law defense?*

Kinmon's next claim is that the district court committed plain error by instructing the jury on a mistake of law defense. He argues that the mistake of law instruction violated his due process rights by shifting the burden to him to prove that his conduct was *not* knowing.

The mistake of law instruction was given to clarify a legal issue that came up in the context of the State's charge that Kinmon committed second-degree tampering with a public record by falsifying the hunt record he submitted for Brian Ailts's caribou hunt (Count VIII). Kinmon was not licensed to guide caribou hunts and he submitted a hunt record for Brian Ailts that indicated that he had "outfitted" (as opposed to "guided") Ailts's caribou hunt. At trial, Ailts testified that Kinmon provided the same assistance on his caribou hunt as he did on his guided moose hunt. Kinmon testified that he had consulted "regulators" on the proper way to fill out the form and that he followed instructions by "carrying the caribou separately" on the hunt record, even though that "did not make sense" to him because the caribou hunt was a "no compensation, absolutely free hunt[.]"

In response to this testimony, the prosecutor asked for an instruction under *Haggren v. State*.[28] In *Haggren*, this Court held that a fisherman could not rely on a mistaken interpretation of the law provided by a state trooper dispatcher, or a fish and wildlife protection officer the dispatcher consulted, to defend against a charge of violating a fishing regulation.[29] This Court explained that even under the Model Penal Code, which contains the broadest formulation of the affirmative "mistake of law" defense,[30] a defendant claiming mistake of law must show that he relied on an "official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."[31]

In accordance with the language in *Haggren*, the trial court instructed the jury as follows:

> A mistake of law constitutes a defense only if the mistake negates the existence of the culpable mental state required to establish a crime. To establish mistake of law, a defendant must show that he relied on an "official interpretation" provided by the "the public officer or body charged by law with enforcement of the law defining the offense" meaning a formal interpretation of the law issued by the chief enforcement officer or agency. This does not encompass, or include, extemporaneous legal advice or interpretations given by a subordinate officer or third parties.

Kinmon's attorney expressly stated that he had no objection to this instruction, and the parties did not discuss the mistake of law instruction in closing

---

[28] *Haggren v. State*, 829 P.2d 842 (Alaska App. 1992), *overruled on other grounds by Allen v. Anchorage*, 168 P.3d 890 (Alaska App. 2007).

[29] *Id.* at 844.

[30] Model Penal Code § 2.04(3)(b) (Am. Law Inst., Proposed Official Draft 1962) *cited in Haggren*, 829 P.2d at 844.

[31] *Haggren*, 829 P.2d at 844.

arguments. During closing arguments, both parties argued that the jury had to find that Kinmon acted knowingly to convict him. The defense attorney explicitly argued that Kinmon's "got to know knowingly that there's some violation of the law there."

On appeal, Kinmon argues that it was error to instruct the jury on the affirmative defense of mistake of law. Kinmon asserts, in particular, that the mistake of law instruction impermissibly shifted the burden of proof with regard to the "knowingly" *mens rea* required for the various charged offenses. But Kinmon did not object to the instruction below, and he must therefore show plain error on appeal. To show plain error of non-constitutional magnitude, Kinmon must show that (1) the error was obvious, (2) the failure to object "was not the result of intelligent waiver or a tactical reason not to object, (3) the error affected substantial rights, and (4) the error was prejudicial.[32]

We do not find plain error here. Although we question the continued validity of this formulation of the mistake of law defense (particularly when used outside the context of strict-liability crimes), the instruction was an accurate description of Alaska law as it currently stands.[33] Notably, neither party relied on the instruction during closing arguments, and the State did not argue that it applied to the *mens rea* requirements. Instead, as the State points out, Kinmon remained free to argue that he made an honest mistake based upon the advice of the trooper, and that the mistake did not amount to knowingly submitting false information on a public record. The jury likewise remained free to reject this defense, which it did for the majority of the counts

---

[32] *Adams v. State*, 261 P.3d 758, 764 (Alaska 2011).

[33] *See Morgan v. State*, 943 P.2d 1208, 1212-13 (Alaska App. 1997); *Haggren*, 829 P.2d at 843-45. *But see* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.6(e)(3), at 559-61 (3d ed. 2017) (noting tension between due process requirements and Model Penal Code approach to mistake of law defense).

except for Count X, for which the jury acquitted Kinmon. Thus, given the manner in which the instruction was used and the absence of any objection, we find no plain error.

*Conclusion*

We REVERSE the convictions for Counts V, VI, VII, and XI and remand for a new trial on those counts. In all other respects, the judgment of the district court is AFFIRMED.

HARBISON, Judge, dissenting.

I disagree with the majority's analysis and conclusion that the term "previously purchased" in AS 16.05.340 is ambiguous and should therefore be construed against the government.

In determining what a statute means, "[u]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."[1] Here, the trial court correctly applied ordinary usage to discern the meaning of "previously purchased," which is not defined in the statute.

The trial court concluded that the statutory prohibition against a nonresident taking a big game animal without "previously purchasing a numbered, nontransferable, appropriate tag"[2] required that the nonresident complete the act of buying the tag prior to the act of taking the animal.

In reaching this conclusion, the trial court noted that Webster's Dictionary defines "previously" as "existing or happening prior to something else in time or order." It further noted that Black's Law Dictionary defines "purchase" as "the act or instance of buying." And, as the State points out in its brief, Webster's Dictionary similarly defines "purchase" to mean "to obtain by paying money or its equivalent."

I agree with the trial court that the term "previously purchased" in the nonresident game tag statute clearly requires a nonresident to complete the act of purchasing a tag — including paying for it — before the nonresident may take a big game animal.

---

[1] *State v. Niedermeyer*, 14 P.3d 264, 272 n.38 (Alaska 2000).

[2] AS 16.05.340(a)(15).

– 18 – 2657

In an attempt to cloud the clear meaning of the term "previously purchased," Kinmon points to the federal securities code and California fish and game statutes. He notes that those statutes, unlike the statute at issue here, define the term "purchase."

Kinmon's argument is inapposite for several reasons. First, the other statutes that he points to, which define the term "purchase," are statutes aimed at different types of conduct than that governed by AS 16.05.340. As a result, the fact that it was necessary for those statutes to define "purchase" has no bearing on whether the term "purchase" is ambiguous in Alaska's statute regarding the purchase of nonresident big game tags.

For example, Kinmon notes that in California's fish and game statutes, the term "purchase" includes "an offer to buy, purchase, barter, exchange, or trade."[3] But California's statutes do not use the term "purchase" to describe the method by which a game tag is obtained; instead, California uses the term "procure" to refer to the method of obtaining a game tag.[4] The term "purchase" is used to govern the transfer of lawfully and unlawfully taken fish and game, and in statutes involving fish and game licenses.[5] Since the California legislature was attempting to limit the transfer of fish and game, it makes sense that the legislature chose to provide a definition for "purchase" that is broader than its ordinary meaning, expanding it to include offers to buy, purchase, barter, exchange or trade.

---

[3]   Cal. Fish & Game Code §§ 68, 24 (West 1985).

[4]   *See, e.g.*, Cal. Fish & Game Code §§ 4332, 4652, 4654, 4750-51 (West).

[5]   *See, e.g.*, Cal. Fish & Game Code §§ 1061, 2124, 2582, 3039, 8395, 12002.3 (West).

The majority points to a few additional state statutes defining "purchase." But the fact that some states have chosen to define "purchase" in a manner that is inconsistent with, and broader than, the ordinary meaning of that term does not persuade me that Alaska's law is unclear. This is particularly true given that Alaska's statute includes the word "previously" to describe when the "purchase" of the tag must occur: the "purchase" of the tag must be "previous" to the nonresident's taking of the animal. This clarifies that the transaction must be complete before the animal can be taken.

Similarly, I disagree that this Court's decision in *State v. Chun* suggests that there is complexity in determining when a purchase takes place for purposes of the statute at issue in this case: the statute governing nonresident big game tags. *Chun* involved a purchase of bear parts over the phone by a person in Alaska from a person in Idaho.[6] Under those facts, the question of when and where the "purchase" took place was ambiguous, because it was unclear under the Uniform Commercial Code where and when title had vested in Chun.[7] But the statute involved in Kinmon's case is not subject to such complications. There is no ambiguity to the statutory requirement in Kinmon's case that a nonresident hunter must "purchase" an appropriate tag *before* taking the animal and must affix the tag to the animal *before* leaving the kill site.[8] Title to the tag must necessarily vest with the hunter prior to the taking of the animal.

On appeal, Kinmon contends that his interpretation of the statutory language "seems to be consistent with others within Alaska's guiding profession." He notes that during the trial, he offered to present the testimony of a master guide who

---

[6]  *State v. Chun*, 1992 WL 12153276, at *1 (Alaska App. Oct. 7, 1992) (unpublished).

[7]  *Id.* at *1-2.

[8]  *See* AS 16.05.340(a)(15).

believed, based on informal inquiries, that it was "standard in the trade" to issue tags before collecting money for the tags.[9]

But the trial court correctly determined that this testimony was more prejudicial than probative, as it could lead to jury confusion about whether the exact language of the law could properly be ignored. The trial court resolved the question of statutory interpretation posed by Kinmon's motion to dismiss by ruling that the statute requires a nonresident hunter to pay for an appropriate tag prior to taking a big game animal. It accordingly found that testimony regarding "an informal poll of other guides who say they collect the money later" could lead the jury to believe that it was not necessary for Kinmon to follow the law. This was a correct ruling.

I disagree with the majority's assertion that the trial court's failure to instruct the jury on the meaning of the term "purchase" entitles Kinmon to reversal of the convictions related to the Hahn and Ailts hunts. In fact, Kinmon does not argue on appeal that the trial court erred in its instructions to the jury on this point.

During closing arguments, relying on the court's ruling regarding the meaning of the term, the prosecutor correctly told the jury that "[p]reviously purchasing . . . doesn't mean to have an agreement to at some point maybe pay for it." Later, the prosecutor did not object when Kinmon's attorney incorrectly argued to the jury that previously purchasing a game tag did not require paying for the tag before taking the animal. The jury nevertheless convicted Kinmon on all relevant charges. The fact that

---

[9] I note that the jury convicted Kinmon of falsifying the tag records relating to a sheep taken by his client, John Maser. Maser testified that Kinmon directed him to backdate the check he gave Kinmon for the sheep tag to a date before he killed the sheep, even though he actually wrote the check after the hunt was over. This testimony strongly suggests that, notwithstanding the proffer, Kinmon believed he was required to collect the payment for the tag prior to the nonresident hunter taking the animal.

the defense attorney made an incorrect statement of the law to the jury that was beneficial to Kinmon does not require reversal of Kinmon's convictions.

I believe that the majority opinion unnecessarily complicates the meaning of an unambiguous statute. While the purchase of a car or a house may routinely involve lengthy written contracts, financing, and liens that make a "purchase" possible without payment in full, the purchase of a big game tag is a straightforward transaction that involves none of these complications. When the words "previously purchased" are given their ordinary, common meaning, the statute clearly requires that a nonresident must pay for the big game tag before taking the animal.[10] I therefore dissent.

---

[10] I additionally note that Kinmon's trial attorney did not challenge AS 16.05.340(a)(15) as ambiguous or unconstitutionally vague. Rather, at the close of the State's case, he asked the court to dismiss the case, arguing that the State had "failed to show even that a crime has been committed." This was essentially a motion for judgment of acquittal. Kinmon's lawyer went on to argue, "There's been no showing that failing to get payment right at the time you get the tags is a crime." On appeal, Kinmon construes this mid-trial remark as an argument that the statute failed to give him notice of what conduct was prohibited. In my view, this argument was not presented to the trial court and was not preserved for this appeal.